EAG:PT
F.#2018R00057

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ FEB 2 1 2018 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

   - against -

MIMO INTERNATIONAL IMPORTS AND
EXPORTS, INC.,

               Defendant.

– – – – – – – – – – – – – – – – – – – – – X

I N F O R M A T I O N

Cr. No. <u>18 - 59 (PKC)</u>
(T. 18, U.S.C., §§ 1349 and 3551 <u>et seq</u>.)

THE UNITED STATES ATTORNEY CHARGES:

<u>INTRODUCTION</u>

At all times relevant to this Information, unless otherwise indicated:

I.   <u>Background</u>

   A.   <u>FIFA</u>

      1.   The Fédération Internationale de Football Association ("FIFA") was the international body governing organized soccer, commonly known outside the United States as football. FIFA was an entity registered under Swiss law and headquartered in Zurich, Switzerland. FIFA comprised as many as 209 member associations, each representing organized soccer in a particular nation or territory, including the United States and four of its overseas territories.

      2.   FIFA first instituted a written code of ethics in October 2004, which code was revised in 2006 and again in 2009 (generally, the "code of ethics"). The code of ethics

governed the conduct of soccer "officials," expressly defined by FIFA's statutes to include, among others, all board members, committee members and administrators of FIFA as well as FIFA's continental confederations and member associations. Among other things, the code of ethics provided that soccer officials were prohibited from accepting bribes or cash gifts and from otherwise abusing their positions for personal gain. The code of ethics further provided, from its inception, that soccer officials owed certain duties to FIFA and its confederations and member associations, including a duty of absolute loyalty. By 2009, the code of ethics explicitly recognized that FIFA officials stand in a fiduciary relationship to FIFA and its constituent confederations, member associations, leagues, and clubs.

B.     <u>CONCACAF</u>

3.     Each of FIFA's member associations also was a member of one of the six continental confederations recognized by FIFA. Among other things, the continental confederations organized the preliminary rounds, or qualifying matches, that national teams played in order to determine whether they would participate in the main World Cup tournament.

4.     The continental confederation covering North America, Central America, and the Caribbean region was the Confederation of North, Central American and Caribbean Association Football ("CONCACAF"), which was incorporated as a non-profit corporation in Nassau, Bahamas. CONCACAF comprised as many as 41 member associations, including those of the United States and two of its overseas territories, Puerto Rico and the United States Virgin Islands. Beginning in 2012, CONCACAF's principal administrative office was located in Miami, Florida. In June 2014, CONCACAF adopted a code of ethics that, among other things, prohibited bribery and corruption.

2

C.    FEDEFUT

5.    The national association of Costa Rica, the Federación Costarricense de Fútbol ("FEDEFUT"), was a national member association of FIFA and CONCACAF, and was based near San José, Costa Rica. Among other things, FEDEFUT was responsible for organizing and equipping the Costa Rican national soccer team, including during World Cup qualifying rounds and the World Cup tournament itself.

6.    From in or about 2007 until in or about May 2015, the president of FEDEFUT was Eduardo Li. As president of FEDEFUT, Li was authorized to negotiate contracts on behalf of FEDEFUT, including contracts with athletic apparel and uniform companies to sponsor and outfit Costa Rican national soccer teams. Pursuant to the FIFA Code of Ethics and, since 2014, the CONCACAF Code of Ethics, Li owed a fiduciary duty to FEDEFUT and was prohibited from, among other things, accepting bribes or kickbacks in connection with decisions he took as president of FEDEFUT.

D.    MIMO, its Principals, and its Sister Companies

7.    The defendant MIMO INTERNATIONAL IMPORTS AND EXPORTS, INC. ("MIMO") was a privately held company organized under the laws of Panama. MIMO was owned by a group of partners, all of whom were Panamanian citizens. These partners included three individuals who each owned less than 20% of MIMO and whose identities are known to the United States Attorney (hereinafter "Partner A," "Partner B," and "Partner C," respectively).

8.    The partners who owned the defendant MIMO also owned, in identical percentages, another privately held Panamanian company, the identity of which is known to the United States Attorney (hereinafter "Sponsorship Company").

3

9.     The business of the defendant MIMO was to import, distribute, and manufacture under license products of an Italian sports apparel company, the identity of which is known to the United States Attorney (hereinafter "Apparel Company #1"). Sponsorship Company's business was to enter into sponsorship contracts on behalf of MIMO to provide soccer clubs and national soccer teams with Apparel Company #1-branded soccer apparel, often with a sponsorship fee paid to the club or national soccer federation as well. Partner A effectively managed MIMO and Sponsorship Company, in consultation with the other partners in those businesses regarding major decisions.

10.     Partner A, Partner B, Partner C, and other owners of the defendant MIMO also owned another privately held Panamanian company, the identity of which is known to the United States Attorney (hereinafter "Import Company"). Partner B effectively managed Import Company on behalf of its other owners. The business of Import Company was the import and distribution of products of an American sports apparel and footwear company based in Massachusetts whose identity is known to the United States Attorney (hereinafter "Apparel Company #2").

II.     The Scheme

11.     In or about 2012, Sponsorship Company renewed a sponsorship agreement with FEDEFUT (the "2012 Agreement"). Under the terms of the 2012 Agreement, Sponsorship Company provided FEDEFUT with both a sponsorship fee and Apparel Company #1-branded apparel that the Costa Rican national soccer team was required to wear, following the import and/or manufacture of that apparel by the defendant MIMO. Li and Partner A negotiated the 2012 Agreement on behalf of FEDEFUT and Sponsorship Company, respectively. The 2012

4

Agreement covered the 2014 and 2018 World Cup qualifying cycles, meaning that the parties were bound by it through the World Cup tournament held in the summer of 2018. The 2012 Agreement also included a clause requiring FEDEFUT to pay a multimillion dollar rescission fee to Sponsorship Company if FEDEFUT broke the 2012 Agreement before the end of the contract period.

12.     In or about August 2014, Li decided that he wanted the Costa Rican soccer team to be sponsored by a different apparel company than Apparel Company #1, and Partner A decided that the defendant MIMO and Sponsorship Company should end their practice of sponsoring soccer teams. MIMO, however, was unwilling to waive the rescission fee in the 2012 Agreement. Therefore, MIMO and Li had difficulty locating another sponsor that was willing to pay enough money to both satisfy the rescission fee and pay FEDEFUT a sponsorship fee at least as large as the fee FEDEFUT was receiving from Sponsorship Company pursuant to the 2012 Agreement.

13.     Representatives of Apparel Company #2 expressed interest in replacing Apparel Company #1 as FEDEFUT's sponsor. Representatives of Apparel Company #2 in Massachusetts communicated about this subject via wire communication, including electronic mail messages and telephone calls, with Li and other FEDEDUT officers and employees in Costa Rica, and with Partner A, Partner B, and employees of the defendant MIMO, Sponsorship Company, and Import Company in Panama. Apparel Company #2 also invited Li to travel to Massachusetts for meetings about the proposed sponsorship agreement, which Li did. Eventually, Apparel Company #2 offered to both pay Sponsorship Company the rescission fee,

5

and also pay a sponsorship fee to FEDEFUT that was larger than the fee FEDEFUT was due under the 2012 Agreement.

14.     Li, on behalf of FEDEFUT, and Partner A, on behalf of Sponsorship Company and the defendant MIMO, then negotiated the specific terms of FEDEFUT's terminating the 2012 Agreement between FEDEFUT and Sponsorship Company.  During those negotiations, Li and Partner A agreed that Li would receive a $500,000 bribe in order to induce Li to sign a new sponsorship agreement with Apparel Company #2 and trigger the payment of the multimillion dollar rescission fee to Sponsorship Company.  Partner C was aware that Partner A and Li had agreed on this bribe.  Partner A did not discuss this bribe agreement with anyone at Apparel Company #2, and he told Li not to discuss this bribe agreement with anyone at Apparel Company #2.

15.     In or about the fall of 2014, Partner A began to collect United States currency in order to pay Li the agreed-upon bribe.  Partner A did so, in part, by having agents of the defendant MIMO collect payments due to MIMO from MIMO customers in United States currency, and then giving that cash to Li.  On some occasions, Partner A directed the cash to Li by having the MIMO agents take it to Li in Costa Rica, and on other occasions, Partner A gave the cash to Li at MIMO's office in Panama City.  In total, Partner A and MIMO paid approximately $306,000 of the agreed-upon $500,000 bribe to Li, before Li was arrested in Zurich, Switzerland on May 27, 2015.

6

<u>WIRE FRAUD CONSPIRACY</u>

16.    The allegations contained in paragraphs one through 15 are realleged and incorporated as if fully set forth in this paragraph.

17.    In or about and between August 2014 and May 2015, both dates being approximate and inclusive, within the District of Massachusetts, the defendant MIMO INTERNATIONAL IMPORTS AND EXPORTS, INC., together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and FEDEFUT, including to deprive FIFA, CONCACAF, and FEDEFUT of their respective rights to the honest and faithful services of Eduardo Li through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: email messages and telephone calls, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 <u>et seq.</u>)

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

7